# EXHIBIT B

FILED
10/14/2015 11:58:30 AM
Donna Kay McKinney
Bexar County District Clerk
Accepted By: Lisa Morales

J/D 2 CITS PPS SAC3

CAUSE NO. **2015CI17400**

| | | |
|---|---|---|
| DAVID MICHELETTI, individually and on behalf of all others similarly situated, | § § § § | IN THE DISTRICT COURT OF |
| Plaintiffs, | § § § | BEXAR COUNTY, TEXAS |
| v. | § § | |
| UBER TECHNOLOGIES, INC., a Delaware corporation; RASIER, LLC, a Delaware limited liability company and subsidiary of UBER TECHNOLOGIES, INC.; JOHN DOES I-V and JANE DOES I-V; BLACK CORPORATIONS I-V; WHITE LIMITED LIABILITY COMPANIES I-V; and GREEN PARTNERSHIPS I-V, | § § **288TH** § § § § § § § § § § | _____ JUDICIAL DISTRICT |
| Defendants. | § § | |

## PLAINTIFFS' ORIGINAL PETITION

Plaintiff David Micheletti, on behalf of himself and all other individuals who have worked or are currently working in Texas as drivers for Defendants Uber Technologies, Inc. and Rasier, LLC (collectively, "Uber"), alleges the following:

### INTRODUCTION

1. This case is about one thing: thousands of hard-working drivers struggling to get by while Uber, a company valued at more than *$50 billion*, exploits them to bolster its bottom line. Though it likes to call itself a technology company, Uber is a transportation company. Uber does not sell software; it sells rides. Uber's drivers—like Plaintiff and the Class he represents—are the lifeblood of the company. Nonetheless, to increase profits, Uber uses its position of power to mislead and take advantage of its drivers at every turn.

2.      Uber refuses to pay its drivers a living wage.  After accounting for drivers' expenses, which Uber should—but does not—pay, most drivers barely earn enough money to make ends meet.  For example, Plaintiff made approximately $5 per hour working for Uber. Moreover, to further squeeze its drivers, Uber routinely misappropriates money from their fares and shirks its financial commitments.  As Charles Dickens famously observed at the beginning of *A Tale of Two Cities*, "[i]t was the best of times, it was the worst of times . . ."  In this story, it's clear who is having "the best of times": Uber continues to achieve record valuations, while its drivers only scrape by.

3.      Uber falsifies the employment status of its drivers.  Though Uber exercises near complete control over its drivers and many of its drivers work the equivalent of two fulltime jobs for Uber, it classifies drivers as "independent contractors," rather than "employees." Why?  So they are not subject to the protections of the Texas Labor Code, and Uber does not have to bear the costs of compliance (*e.g.*, paying its drivers at least minimum wage).

4.      Uber misrepresents how drivers are paid so that it can keep a larger percentage of the fares they generate.  Uber tells customers that gratuity is included in the fares charged when they use Uber's electronic payment service.  In reality, however, Uber fails to remit the gratuity to its drivers.  Instead, Uber lines its own pockets with the drivers' money.

5.      Plaintiff brings this action to prevent Uber from continuing to ride roughshod over its drivers' contractual and statutory rights and to return to Uber's drivers what is rightfully theirs.

6.      Accordingly, Plaintiff seeks to recover damages for Uber's numerous violations of the Texas Labor Code: (a) failure to maintain payroll records in violation of Texas Labor Code § 21.301; (b) failure to pay minimum wages in violation of Texas Labor Code § 62.001,

*et seq.*; (c) failure to pay wages promptly upon resignation and termination in violation of Texas Labor Code § 61.014; and (d) failure to pay and improper retention of gratuities in violation of Texas Labor Code § 61.015.

7.      Plaintiff also seeks to recover damages for Uber's many common-law violations: (a) tortious interference with prospective business relations; (b) breach of contract; (c) promissory estoppel; (d) unjust enrichment; (e) conversion; (f) unfair competition; and (g) fraud.

## DISCOVERY LEVEL

8.      Discovery in this case will be conducted according to Level 3 under Texas Rule of Civil Procedure 190.4.

## PARTIES, JURISDICTION, AND VENUE

9.      David Micheletti is a resident of Bexar County, Texas, where he worked as an Uber driver.

10.     Uber Technologies, Inc. is a Delaware corporation headquartered in San Francisco, California that is authorized to conduct business and does conduct business throughout Texas, including in Bexar County.  It provides a service where individuals can login to a software application on their smartphone, request a ride, and be paired with an available driver.

11.     Rasier, LLC, a Delaware limited liability company headquartered in San Francisco, is a subsidiary of Uber Technologies, Inc. and is its equivalent for purposes of this action.  It is authorized to conduct business and does conduct business throughout Texas, including in Bexar County.

12.     John Does I-V and Jane Does I-V, Black Corporations I-V, White Limited

3

Liability Companies I-V, and Green Partnerships I-V are fictitious Defendants whose true names or capacities, whether individual, corporate, or otherwise, are unknown to Plaintiff at this time. Plaintiff therefore sues these Defendants by fictitious names and will seek leave to amend this Petition when their true names and capacities become known.

13.     The amount in controversy exceeds the minimum jurisdictional limit of this Court.

14.     Venue is proper in Bexar County, Texas because Uber conducts business in Bexar County, Plaintiff is a resident of Bexar County, and the events that give rise to Plaintiff's causes of action occurred in Bexar County.

## FACTUAL ALLEGATIONS

**A.     Uber increases its profits by not paying its drivers a living wage.**

15.     In 2013, Plaintiff began working for Uber as an UberX and UberXL driver.

16.     From 2013 until approximately five months ago, on average, Plaintiff drove 70 hours per week. For the last five months, Plaintiff drove approximately 20 hours per week.

17.     Plaintiff recently stopped working for Uber due to his inability to earn a living wage.

18.     Uber compensates its drivers weekly. Uber takes 20% of the total fares and the driver receives the remaining 80%. Plaintiff was compensated $500-$600 per week and incurred $100-$200 per week in expenses, including gas, tolls, lease payments, and car repairs.

19.     Thus, after expenses, Plaintiff made approximately $5 per hour—$2.25 less than the minimum wage.

**B.**     **Uber increases its profits by deceiving its drivers.**

20.     Uber routinely misappropriates money from its drivers' fares.  Specifically, Uber deducts a $1 "safe ride" fee from each fare, which is allegedly used to pay for background checks, driver safety education, and development of safety features in its mobile application—an expense that Uber, the employer, should pay.

21.     Uber routinely fails to honor its financial commitments to its drivers.  For example, Uber's contract provides that drivers must be compensated $6.00 for cancelled fares.  Although Uber compensated Plaintiff for approximately 20 cancelled fares, he was not compensated for over 70 cancelled fares.  Uber also told Plaintiff that he would receive a credit card that would entitle him to a discount on fuel once he completed 20 rides; however, Uber never provided the promised card.

22.     Uber routinely misleads its drivers regarding the amount of money that they can earn.  For example, Uber told Plaintiff that drivers can earn guaranteed pay (surge fares of over $20 per hour) working at certain times.  But Plaintiff did not earn the guaranteed hourly pay that Uber promised.

**C.**     **Uber increases its profits by misappropriating its drivers' tips.**

23.     During the course of his employment, Plaintiff did not receive gratuities.

24.     But Uber told customers, on its website and in marketing materials, that gratuity is included in the total cost of the fare for the car service and that there is no need to tip the driver:

## DO I NEED TO TIP MY DRIVER?

You don't need cash when you ride with Uber. Once you arrive at your destination, your fare is automatically charged to your credit card on file – there's no need to tip.

25. In other words, Uber intentionally misrepresented to customers that gratuity was included in the cost of its fares and thus instructed them not to leave a tip in addition to the amount of the fare.

26. Via its training video, Uber also misrepresented to Plaintiff that tips would be added to his wages. Uber told him not to ask for or accept tips because passengers would tip based on service by selecting a percentage on the Uber application, and the tips would be passed on to him.

27. Despite Uber's misrepresentations to customers that "there's no need to tip" because gratuity is included in the fare and misrepresentations to Plaintiff and other drivers that tips would be added to their wages, Plaintiff and other drivers did not receive their gratuities.

28. Plaintiff contacted Uber twice about why he did not receive the tips that passengers had paid him through Uber's application. But Uber simply ignored him and did not respond.

**D.    Uber increases its profits by misclassifying its drivers as independent contractors.**

29. Uber uniformly misclassifies its drivers, including Plaintiff, as independent contractors when they are employees.

30. Uber is deeply involved in marketing its transportation services, qualifying and selecting drivers, regulating and monitoring drivers' performance (including disciplining or terminating those who fail to meet standards), and setting prices.

31. Uber exercises substantial control over the qualification and selection of its drivers. Before working for Uber, prospective employees must first complete Uber's application process, including a background check, city knowledge exam, vehicle inspection, and personal interview.

32.     Uber exercises considerable control and supervision over the work details of its drivers—the manner, methods, and means of its drivers' provision of transportation services. For example, upon signing an agreement to work for Uber, new drivers must watch a video demonstrating how Uber wants them to interact with customers.  Drivers are even instructed on such simple tasks as how to pick up a customer with their car.  In short, Uber retains all necessary control over its drivers' performance.

33.     Uber controls the instrumentalities of Plaintiff's job.  Drivers cannot use a car that is more than ten years old and Uber controls its drivers' car registrations.  For example, Plaintiff's car registration was due at the end of September 2015.  But Uber suspended his driving privileges during the entire month of September, despite Plaintiff's legal right to continue driving.  Moreover, though Plaintiff paid his registration in advance, Uber did not reactivate his driving privileges.

34.     Uber monitors its drivers to ensure compliance with Uber's quality control standards.  All drivers for Uber, including Plaintiff, must maintain an average customer rating of at least 4.5 out of a possible 5 stars.  Instructions on how to improve one's star rating are given to drivers who fall below this average in any given week.  If a driver fails to maintain an average customer rating of 4.5, Uber deactivates the driver's ability to use its application to pick up customers, an action tantamount to terminating the driver "at will," a hallmark of an employer-employee relationship.  Thus, monitoring through rider ratings is an effective mechanism for Uber to enforce its standards.

35.     Uber unilaterally sets the fares—with no negotiation or input from drivers— for all rides, and drivers are required to charge the cost determined solely by Uber.  Uber then bills

customers for the entire amount before remitting a portion of the fare to its drivers.  Uber pays its drivers weekly.

36.     Many drivers work well over 40 hours per week for Uber.  For example, until approximately five months ago, Plaintiff worked an average of 70 hours per week.

37.     Uber claims a proprietary interest in its riders, which further demonstrates that Uber acts as more than a mere intermediary between riders and drivers.  For example, Uber prohibits its drivers from answering rider queries about booking future rides outside the Uber application or otherwise soliciting riders.

38.     As a result of the intentional misclassification of its employees, Uber failed to provide Plaintiff and other similarly aggrieved drivers with itemized wage statements, minimum wages, and reimbursement for necessary expenses (*e.g.*, gas, tolls, car repairs, and lease payments).  Uber also failed to keep accurate payroll records evidencing Plaintiff's and other drivers' hours worked and wages paid and unlawfully retained gratuities owed to Plaintiff and other drivers, despite representing to customers and its drivers that gratuity is included in the total cost of the service.

## CLASS ACTION ALLEGATIONS

39.     Plaintiff brings this class action pursuant to Texas Rule of Civil Procedure 42 on behalf of himself and all other similarly situated drivers of Uber who work or have worked in Texas.

40.     Subject to additional information obtained through further investigation and discovery, the foregoing definition of the Class may be expanded or narrowed by amendment. Excluded from the Class are Defendants and their affiliates, parents, subsidiaries, employees, officers, agents, and directors; government entities or agencies and their affiliates, employees,

officers, agents, and directors in their governmental capacities; any judicial officers presiding over this matter and the members of their immediate families and judicial staff; and Class counsel.

41.     This action is properly maintainable as a class action.

42.     As provided in Texas Rule of Civil Procedure 42(a)(1), the proposed Class "is so numerous that joinder of all members, whether otherwise required or permitted, is impracticable."

43.     As provided in Texas Rule of Civil Procedure 42(a)(2), "there are questions of law or fact common to the Class which predominate over any questions affecting only individual members." Among the questions of law and fact common to the Class include, but are not limited to, the following:

    a.   whether Uber has charged customers a gratuity for Class members' services;

    b.   whether Uber failed to distribute the total proceeds of those gratuities to Class members;

    c.   whether Uber informed customers that gratuity is included in the price of the service, so there is no additional need to tip Class members;

    d.   whether Class members have suffered damages based on Uber's misrepresentation to customers that "there's no need to tip";

    e.   whether Uber improperly classified Class members as independent contractors rather than employees;

    f.   whether Class members have been required to pay the expenses of their employment, including the cost of a vehicle, repairs, gas, and tolls;

    g.   whether Uber unlawfully denied compensation to Class members; and

9

h.   whether Class members were denied employee benefits as required by law.

44.    As provided in Texas Rule of Civil Procedure 42(a)(3), the claims of the proposed lead Plaintiff are typical of those of the proposed Class because they are based on the same legal theories and arise out of the same business practices and course of conduct by Uber.

45.    As provided in Texas Rule of Civil Procedure 42(a)(4), the proposed lead Plaintiff can adequately represent the Class because no conflict of interest exists between him and the Class members or with respect to the requested claims for relief.

46.    The proposed lead Plaintiff and his chosen attorneys are familiar with the subject matter of the lawsuit and have full knowledge of the allegations contained in this Petition so as to be able to assist in its prosecution.  The attorneys are competent in the relevant areas of the law and have sufficient experience to vigorously represent the Class.  The attorneys also have sufficient financial resources and are willing to absorb the costs of the litigation, which ensures that the litigation will not be hampered by a lack of financial capacity.

47.    As provided in Texas Rule of Civil Procedure 42(a)(5), a class action is superior to any other available method for adjudicating this controversy.  The proposed class action is the surest way to fairly and expeditiously compensate so large a number of injured persons; to keep the courts from becoming paralyzed by hundreds, perhaps thousands of repetitive cases; and to reduce transaction costs so that the injured Class members can obtain the most compensation possible.  In short, class treatment presents the best mechanism for fairly resolving similar issues and claims without repetitious and wasteful litigation.

## CAUSES OF ACTION

### COUNT I: TORTIOUS INTERFERENCE WITH
### PROSPECTIVE BUSINESS RELATIONS

48.     Plaintiff, on behalf of himself and the proposed Class, repeats and incorporates the allegations above as if fully set forth herein.

49.     Uber interfered with the continuing business relationship between drivers and riders—a separate relationship from that between either Uber and its drivers or Uber and its riders, and one to which Uber is not a party—whereby riders would have paid gratuity to drivers, including Plaintiff, absent Uber's interference.

50.     Uber intentionally and maliciously interfered with Plaintiff and other drivers' enjoyment of an expectancy of tips from passengers by intentionally misrepresenting that gratuity was included in the cost of its fares.

51.     For example, Uber specifically advertises to customers that tips are included in the cost of the fare:

## DO I NEED TO TIP MY DRIVER?

You don't need cash when you ride with Uber. Once you arrive at your destination, your fare is automatically charged to your credit card on file — there's no need to tip.

52.     In reality, however, Uber collected gratuities and then failed to remit them to drivers.

53.     Based on its past practices of not remitting gratuities to drivers, Uber knew that it was going to retain the tips for itself when it misrepresented that tips would be passed on to its drivers.

54.     Were it not for Uber's misrepresentations regarding gratuities, drivers, including Plaintiff, would have received tips.

55.     Uber knew that this would be a benefit accruing to the drivers at the time it discouraged tipping by telling passengers tipping is included in the fare and knew the interference was certain or substantially certain to occur as a result of the conduct.

56.     Uber's conduct damaged Plaintiff and other drivers.

### COUNT II: BREACH OF CONTRACT

57.     Plaintiff, on behalf of himself and the proposed Class, repeats and incorporates the allegations above as if fully set forth herein.

58.     Uber has an implied contract with Plaintiff and other drivers to remit the total proceeds of all gratuities, as well as to reimburse for expenses.

59.     Plaintiff and other drivers are third-party beneficiaries of customers' implied contract with Uber requiring tips to be remitted to drivers, the terms of which were incorporated by reference from certain advertisements or statements Uber made.  By entering into this agreement, customers intended to secure a financial benefit for drivers, including Plaintiff, in the form of gratuity and to act directly for the drivers' benefit.

60.     Uber withheld and continues to withhold gratuities and has not reimbursed expenses.

61.     Uber contracted with Plaintiff and other drivers to pay surge fares, to provide a credit card entitling drivers to a discount on gas, and to pay $6.00 for cancelled fares.

62.     Uber has failed to pay surge fares, to provide a credit card entitling drivers to a discount on gas, and to pay $6.00 for cancelled fares.

63.     Uber's conduct damaged Plaintiff and other drivers.

## COUNT III: PROMISSORY ESTOPPEL

64.    Plaintiff, on behalf of himself and the proposed Class, repeats and incorporates the allegations above as if fully set forth herein.

65.    Uber promised to remit all gratuities to Plaintiff and other drivers in their paycheck.  Instead, Uber kept the tips for itself.

66.    Based on its past practices of not paying tips to drivers, Uber knew at the time it made the promise that it was a lie.

67.    Plaintiff and other drivers relied to their detriment on Uber's promise in continuing to drive for Uber and not seeking additional tips from passengers.

68.    Plaintiff and other drivers' reliance was foreseeable because Uber—the entity that actually determines and pays drivers' compensation—made the false promise.

69.    Uber's conduct damaged Plaintiff and other drivers.

70.    Injustice can be avoided only by enforcing Uber's promise to remit all gratuities to Plaintiff and other drivers.

## COUNT IV: UNJUST ENRICHMENT

71.    Plaintiff, on behalf of himself and the proposed Class, repeats and incorporates the allegations above as if fully set forth herein.

72.    Uber unlawfully retained gratuities and surge fares promised to Plaintiff and other drivers and did not reimburse expenses.

73.    Uber obtained these benefits from Plaintiff and other drivers by making material misrepresentations and taking undue advantage of them.

74.    As a result, Uber has been unjustly enriched.

75.    Uber's conduct damaged Plaintiff and other drivers.

## COUNT V: CONVERSION

76.     Plaintiff, on behalf of himself and the proposed Class, repeats and incorporates the allegations above as if fully set forth herein.

77.     Plaintiff and other drivers had the right to possession of tips, surge fares, cancellation fees, and money spent for expenses.

78.     Uber interfered with Plaintiff and other drivers' right to their property by refusing to relinquish the property to them.  Instead, Uber retained the property for its own benefit.

79.     The converted property was personal.  For example, tips were specifically earmarked for Plaintiff and other drivers.

80.     Uber's conduct damaged Plaintiff and other drivers.

## COUNT VI: UNFAIR COMPETITION

81.     Plaintiff, on behalf of himself and the proposed Class, repeats and incorporates the allegations above as if fully set forth herein.

82.     Plaintiff and other drivers spent extensive time, labor, skill, and money so that they could drive for Uber.

83.     Uber misappropriated Plaintiff and other drivers' work product for its commercial advantage (*i.e.*, so that it could gain a competitive advantage in the transportation industry) and to the commercial detriment of Plaintiff and other drivers.

84.     Uber's conduct damaged Plaintiff and other drivers.

## COUNT VII: FRAUD

85.     Plaintiff, on behalf of himself and the proposed Class, repeats and incorporates the allegations above as if fully set forth herein.

86.     Uber represented to Plaintiff and other drivers that they would receive gratuities, surge fares, and cancellation fees.  Uber did not pay these monies as promised.

14

87.    These misrepresentations were material because they affected Plaintiff and other drivers' decisions to continue driving for Uber.

88.    Uber knew at the time it made these misrepresentations—or, at the very least, made the misrepresentations recklessly—that it would not pass along these monies to Plaintiff and other drivers based on its past practices of not doing so.

89.    Plaintiff and other drivers reasonably and justifiably relied on these misrepresentations and continued to drive for Uber because Uber was their employer and the party responsible for overseeing the payment of these monies.

90.    Uber's conduct damaged Plaintiff and other drivers.

**COUNT VIII: VIOLATIONS OF THE TEXAS LABOR CODE**

91.    Plaintiff, on behalf of himself and the proposed Class, repeats and incorporates the allegations above as if fully set forth herein.

92.    Despite the existence of an agreement indicating that Plaintiff and other drivers are independent contractors, Uber's treatment of and control over them indicate that they are employees.

93.    Accordingly, Uber's actions detailed above violate the following sections of the Texas Labor Code: (a) failure to maintain payroll records in violation of Texas Labor Code § 21.301; (b) failure to pay minimum wages in violation of Texas Labor Code § 62.001, *et seq*.; (c) failure to pay wages promptly upon resignation and termination in violation of Texas Labor Code § 61.014; and (d) failure to pay gratuities in violation of Texas Labor Code § 61.015.

94.    Uber's conduct damaged Plaintiff and other drivers.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the proposed Class, requests relief against Uber as follows:

   a.   an award of liquidated damages, compensatory damages, punitive damages, and treble damages, in an amount to be determined at trial;

   b.   notice to the Class of the action;

   c.   an injunction prohibiting Uber and all those in concert with it from engaging in each of the unlawful practices and policies set forth above;

   d.   reasonable attorneys' fees and costs;

   e.   pre-judgment and post-judgment interest at the highest rate provided by law; and

   f.   such other and further relief that the Court deems just and proper.

## JURY DEMAND

Plaintiff, on behalf of himself and the proposed Class, demands a trial by jury on all claims so triable.

Dated: October 14, 2015.                          Respectfully submitted,

                                                  */s/ Paul B. Maslo*
                                                  Paul B. Maslo
                                                  Texas Bar No. 24091781
                                                  DIAMOND MCCARTHY LLP
                                                  2711 North Haskell Avenue, Suite 3100
                                                  Dallas, Texas 75204
                                                  Telephone: (214) 389-5300
                                                  Facsimile: (214) 389-5399
                                                  Email: PMaslo@diamondmccarthy.com

                                                  Marie Napoli
                                                  Paul J. Napoli
                                                  NAPOLI LAW PLLC
                                                  1301 Avenue of the Americas, 10th Floor
                                                  New York, New York 10019
                                                  Telephone: (212) 397-1000
                                                  Email: MNapoli@napolilaw.com
                                                          PNapoli@napolilaw.com

Vincent Imbesi
Jeanne Lahiff
IMBESI LAW P.C.
450 Seventh Avenue, Suite 1408
New York, New York 10123
Telephone: (212) 736-0007
Email: vimbesi@lawicm.com
       jlahiff@lawicm.com

*Counsel for Plaintiffs*